1
2
3
4
5
6
7
8
9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10   CLANCY ANNE HARRIS,

11                    Plaintiff,

12                                                    CASE NO. C08-432JLR

13          v.
                                                     FINDINGS OF FACT AND
14   UNITED STATES OF AMERICA,                       CONCLUSIONS OF LAW

15                    Defendant.

16

17          This matter came before the court on a bench trial on April 20, 2009, on Plaintiff

18   Clancy Anne Harris's complaint for damages for personal injuries under the Federal Tort

19
     Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671-2680.  Ms. Harris was represented by
20

21   Ann H. Rosato and Michael S. Wampold of Peterson Young Putra, PS.  Defendant the

22   United States of America ("Government") was represented by J. Michael Diaz and Maren
23
     R. Norton of the United States Attorney's Office for the Western District of Washington.
24

25          At trial, the parties presented testimony from three lay witnesses, Ms. Harris, her

26   mother, Teri Harris, and her co-worker, Kendal Gelfand; perpetuation testimony from lay
27

28

witnesses Drs. Richard Bouché, Mitchel Storey, and J. Michael Watt, who all treated Ms. Harris; perpetuation testimony from lay witness Hanson Liu, Ms. Harris's husband; and perpetuation testimony from expert witness Dr. Eugene Toomey. The court admitted Ms. Harris's trial exhibits 1 through 25, the Government's trial exhibits A1 through A7, and the exhibit marked as P-Toomey-1.

On April 27, 2009, at the conclusion of the trial, the court took the matter under advisement. Having considered the evidence and arguments presented, the court makes the following Findings of Fact and Conclusions of Law:

## I. FINDINGS OF FACT

1. On September 13, 2005, Ms. Harris was crossing the street at the intersection of Fourth Avenue and Wall Street in downtown Seattle, Washington.

2. Theodore Schaeffer, an employee of the United States Navy, was driving a vehicle owned by the Navy and was acting in the course and scope of his employment at the time.

3. While Ms. Harris was walking in the crosswalk with a walk signal, Mr. Schaeffer turned from Fourth Avenue onto Wall Street. Mr. Schaeffer did not see Ms. Harris and ran over Ms. Harris's right foot and ankle. (Verbatim Report of Proceedings, April 20, 2009, Testimony of Clancy Anne Harris ("Harris Test.") (Dkt. # 52) at 40.) Ms. Harris's body twisted in response to her foot and ankle being pinned beneath the wheel of the vehicle. (*Id.*) Ms. Harris did not fall to the ground at the moment of the collision; she either hopped or crawled to the sidewalk. (Harris Test. at 41.) Ms. Harris was driven by

ambulance from the site of the collision to Swedish Medical Center. (Harris Test. at 41-42.)

4. Dr. Mitchel Storey of the Sports Medicine Clinic, Ms. Harris's primary care physician, has overseen and coordinated all of Ms. Harris's medical care related to the September 13, 2005 collision. (Perpetuation Deposition of Mitchel D. Storey ("Storey Dep.") at 4-5.)

5. Dr. Richard Bouché of the Sports Medicine Clinic performed three surgeries on Ms. Harris to treat her injuries from the collision. On March 21, 2006, Dr. Bouché performed a fifth metatarsal resection and nerve decompression on Ms. Harris's right foot. (Proposed Pretrial Order, Agreed Facts ("Agreed Facts") (Dkt. # 43) ¶ 3(a)(iii).) On January 9, 2007, Dr. Bouché performed an arthroscopy of Ms. Harris's right ankle with extensive debridement. (Id.) On January 23, 2007, Dr. Bouché performed a Brostrom repair of Ms. Harris's right ankle. (Id.) Ms. Harris experienced improvement following each surgery.

6. In addition to the three surgeries, Ms. Harris underwent other medical treatment for injuries sustained from the collision: she attended 52 medical appointments with Dr. Storey and/or Dr. Bouché at the Sports Medicine Clinic; she attended 29 physical therapy appointments; she attended 7 appointments with Dr. J. Michael Watt, an orthopedic surgeon; she underwent 6 magnetic resonance imaging ("MRI") tests, 1 electromyography ("EMG") study, and 1 bone scan study. Ms. Harris was non-weight bearing for 13 weeks and wore a walking boot for 8 weeks.

1     7.    <u>Right Knee</u>. Ms. Harris suffered injury to her right knee as a proximate result of

2

3 the September 13, 2005 collision. (Storey Dep. at 10; Perpetuation Deposition of Eugene

4 P. Toomey ("Toomey Dep.") at 24; Perpetuation Deposition of J. Michael Watt ("Watt

5 Dep.") at 15, 36-37.) Ms. Harris's right knee injury is an injury to the proximal

6 tibiofibular ("tib-fib") joint. (Storey Dep. at 9-10.) The injury is permanent. (Storey

7

8 Dep. at 10; Watt Dep. at 26.) It is unlikely that the tib-fib injury could be corrected with

9 future operations; Drs. Storey and Watt do not recommend further treatment. (Storey

10 Dep. at 10; Watt Dep. at 28, 29-32.) Ms. Harris will have some level of chronic pain in

11 her right knee for the rest of her life. (Storey Dep. at 10; Ex. 1 at 1-00080.)

12

13     8.       At trial, Ms. Harris testified that the level of pain associated with her tib-fib injury

14 has not improved since the collision. (Harris Test. at 59.) She describes the pain in her

15 right knee as "horrible, stabbing, burning pain" and stated that it feels as if "someone

16

17 were to take a cigarette butt and twist it into the joint" of her knee, with "burning pain"

18 shooting in different directions. (Harris Test. at 53.) Ms. Harris testified that her knee

19 hurts all the time. (*Id*.)

20

21     9.       Dr. Toomey testified, and the court agrees, that Ms. Harris's perception of pain

22

23 "did not really correlate" and was "out of proportion" with the results of her physical

24 examinations and her level of activity. (Toomey Dep. at 39.) He stated that the pain

25 associated with the tib-fib injury is "real pain, but it's a nuisance pain . . . ." (Toomey

26

27 Dep. at 27.) Dr. Storey testified that he believes Ms. Harris's pain associated with the

28 tib-fib injury is "mostly activity related" and that it is generally "mild." (Storey Dep. at

FINDINGS OF FACT & CONCLUSIONS OF LAW – 4

49.)  He further described Ms. Harris's pain from her tib-fib injury as "a nuisance for her."  (Storey Dep. at 36.)

10.     The court is satisfied that Ms. Harris has presented sufficient evidence to establish that she experiences some limited pain associated with the injury to her tib-fib joint on a regular basis and that she will more likely than not continue to experience this pain for the rest of her life.

11.     Ms. Harris experiences mechanical catching in her right knee.  (Watt Dep. at 15.) Dr. Watt testified that it is unclear what caused the mechanical catching.  (Watt Dep. at 15, 41.)  Dr. Watt testified that Ms. Harris's symptoms associated with the mechanical catching are not related to the injury to her tib-fib joint.  (Watt Dep. at 41.)  Dr. Watt stated that the mechanical catching could cause some pain.  (Watt Dep. at 42.)  The court finds that the mechanical catching was not proximately caused by the September 13, 2005 collision.

12.     <u>Right Ankle & Foot</u>.  Ms. Harris suffered injury to her right ankle and right foot as a proximate result of the September 13, 2005 collision.  (Bouché Dep. at 20; Storey Dep. at 9; Watt Dep. at 15, 36-37.)  Ms. Harris has a permanent injury to her superficial peroneal nerve at the ankle, which results in "some residual numbness."  (Toomey Dep. at 20-22.)  Drs. Bouché and Storey testified that Ms. Harris currently has little or no pain in her right ankle caused by the collision.  (Bouché Dep. at 77-78; Storey Dep. at 45.) She requires no further treatment to her right ankle.  (Storey Dep. at 45; *see* Bouché Dep.

at 77-78.)  Similarly, Drs. Bouché and Storey testified that Ms. Harris currently has little or no pain in her right foot caused by the collision.  (Bouché Dep. at 78; Storey Dep. at 44.)  Ms. Harris has some residual, permanent numbness to her foot.  (Toomey Dep. at 21.)  She requires no further treatment to her right foot.  (Storey Dep. at 44-45.)

13.     At trial, Ms. Harris testified that the surgeries "helped quite a bit," but that her right ankle "still aches across the front of the ankle, down the side."  (Harris Test. at 57.)  She stated that her right ankle is more stable than it was prior to the surgeries.  (*Id.*)  She testified that she continues to experience "numbness down the side of [her] foot into [her] last three toes."  (*Id.*)  Ms. Harris also testified that her foot is "stiff" and that "[t]he range of motion isn't there completely."  (Harris Test. at 57-58.)

14.     The court is satisfied that Ms. Harris has established that she experiences mild ache in her right ankle and that her right foot is partially numb.  Ms. Harris will more likely than not continue to experience this level of pain and numbness for the rest of her life.  The court also finds that Ms. Harris has regained most, but not all, of her original range of motion.

15.     In April 2008, Dr. Bouché treated Ms. Harris for plantar fasciitis.  (Bouché Dep. at 76-77.)  Ms. Harris's plantar fasciitis is unrelated to either her foot or ankle injury caused by the September 13, 2005 collision.  (Bouché Dep. at 77.)

16.     <u>Lower to Middle Back</u>.  Ms. Harris suffered injury or strain to her lower to middle back as a proximate result of the September 13, 2005 collision.  (Storey Dep. at 11; Toomey Dep. at 34 (strain, not injury).)  Dr. Storey describes Ms. Harris's back injury as

a soft tissue injury to her middle to lower back. (Storey Dep. at 10.) She requires no further treatment for her back injury or strain other than exercise and anti-inflammatory medication. (Toomey Dep. at 36.) Dr. Storey testified that the condition of Ms. Harris's back will not improve in the future. (Storey Dep. at 38.)

17.    Ms. Harris testified that her back injury or strain continues to "ache" but "[n]ot all the time." (Harris Test. at 60.) She describes her back pain as "more a burning pain" that "shoots out a little bit." (*Id.*)

18.    The court is satisfied that Ms. Harris has established that she experiences mild pain in her lower to middle back on an occasional basis, and that she will more likely than not continue to experience this pain for the rest of her life.

19.    In 2001, while driving, Ms. Harris was hit by another car in a rear-end collision. (Harris Test. at 33, 80.) She experienced whiplash to her upper back and neck. (Harris Test. at 34.) These symptoms resolved within a month or two. (*Id.*) The court finds that the 2001 collision did not cause Ms. Harris's back injury or strain from the September 13, 2005 collision.

20.    In November 2006, while driving, Ms. Harris was again hit by another car in a rear-end collision. (Harris Test. at 79.) Dr. Storey testified that Ms. Harris's injuries from the November 2006 collision do not correlate with her lower and middle back injury or strain caused by the September 13, 2005 collision. (Storey Dep. at 28-29.) Dr. Toomey testified that he has never seen a rear-end collision that did not aggravate preexisting back pain, but stated that he could not determine the extent to which Ms.

FINDINGS OF FACT & CONCLUSIONS OF LAW – 7

Harris's back injury or strain was aggravated by the 2006 collision. (Toomey Dep. at 36.) The court finds that the Government has not met its burden in showing that the November 2006 collision aggravated Ms. Harris's back injury or strain caused by the September 13, 2005 collision.

21.     Ms. Harris was severely inconvenienced by the September 13, 2005 collision. Ms. Harris describes the pain she experienced in the first months after the collision as "pretty horrible, intense pain." (Harris Test. at 42.) She states that she was emotionally "horrified" by the experience. (*Id.*) The court finds that Ms. Harris experienced pain, suffering, and inconvenience as a proximate result of the September 13, 2005 collision during the months following the collision and during her period of medical treatment and recovery, but expresses skepticism about the alleged horror of the experience. (*Id.*)

22.     Prior to the September 13, 2005 collision, Ms. Harris was an active woman who engaged in dancing, running, snowboarding, tennis, wakeboarding, walking, and shopping on a regular basis. (Harris Test. at 35.) Ms. Harris is less active since the September 13, 2005 collision. (Harris Test. at 61.) Ms. Harris has not attempted to wakeboard or snowboard since the collision. (Harris Test. at 62-63.) She has tried dancing, jogging, and tennis since the collision, but these activities have caused increased pain. (Harris Test. at 61-63.) Ms. Harris walks on a regular basis and practices yoga. (Verbatim Report of Proceedings, April 20, 2009, Testimony of Kendall Gelfand ("Gelfand Test.") (Dkt. # 52) at 22; Harris Test. at 61, 63, 75.)

23.     Dr. Storey testified that the injury to Ms. Harris's tib-fib joint will cause soreness or pain when she engages in running or jumping-type activities, including dancing, running, skiing, snowboarding, tennis, and wakeboarding.  (Storey Dep. at 36.)  Dr. Watt testified that there are no specific restrictions on Ms. Harris's activities as a result of her injuries from the September 13, 2005 collision.  (Watt Dep. at 52.)  He explained that Ms. Harris would have to "see how it goes" with different exercises and "figure out how to manage."  (Watt Dep. at 52.)  Dr. Watt testified that he did not know whether Ms. Harris would be able to perform straight-ahead activities like biking, jogging, and walking in a comfortable manner.  (Watt Dep. at 53-54.)

24.     The court finds that as a proximate result of the September 13, 2005 collision, Ms. Harris will experience some loss of enjoyment with activities such as dancing, tennis, and running, and that this loss of enjoyment will more likely than not continue for the rest of her life.

25.     Ms. Harris currently works as a hair colorist at Gene Juarez Salon in downtown Seattle, Washington.  She began working at Gene Juarez Salon prior to the September 13, 2005 collision.  The September 13, 2005 collision affected Ms. Harris's enjoyment of her profession.  Ms. Harris's job requires her to stand for hours at a time, and she experiences some knee pain as her work day progresses.  (Gelfand Test. at 21; Harris Test. at 53.)Dr. Storey testified that the knee pain described by Ms. Harris is consistent with the injury to her tib-fib joint.  (Storey Dep. at 36.)  The court finds that Ms. Harris cannot stand for a full day at work without experiencing some pain.

26.     Ms. Harris wore high-heeled shoes on a regular basis from a young age and enjoyed wearing high-heeled shoes prior to the collision.  (Harris Test. at 66.)  Ms. Harris testified that she tried wearing high-heeled shoes at home and tried wearing high-heeled shoes "a couple times" at work, but "didn't wear them every day."  (Harris Test. at 65; *see also* Gelfand Test. at 20-21.)  Dr. Storey testified that he told Ms. Harris to wear supportive shoes at all times and to not wear high-heeled shoes.  (Storey Dep. at 47.)  He further testified that Ms. Harris's decision to try high-heeled shoes at work did not make her injuries any worse.  (Storey Dep. at 54.)  Dr. Bouché also testified that he recommended she not wear high-heeled shoes.  (Bouché Dep. at 74.)  Dr. Toomey testified that wearing high-heeled shoes "would be contraindicated after having a Brostrom construction in that they would be putting stress on the ligaments" and that high-heeled shoes are not "the shoe of choice to rehabilitate" a foot.  (Toomey Dep. at 40.)

27.     The court finds that Ms. Harris wore high-heeled shoes at home and at work on a limited number of occasions.  The court finds that Ms. Harris is unable to wear high-heeled shoes without some level of pain.

28.     Ms. Harris was 24 years old at the time of the collision.  (Harris Test. at 42.)  Ms. Harris is currently 28 years old.  (Verbatim Report of Proceedings, April 20, 2009, Testimony of Teri Harris (Dkt. # 52) at 87.)  She has a remaining life expectancy of 52.80 years.  *See* Washington Pattern Jury Instruction ("WPI") 34.04; Office of the Insurance Commissioner, Life Expectancy Tables; *see also* RCW 48.02.160.

FINDINGS OF FACT & CONCLUSIONS OF LAW – 10

29.     Ms. Harris will likely require foot orthotics for the remainder of her life.  (Bouché Dep. at 64; Storey Dep. at 38.)  A pair of orthotics costs $375.70.  (Ex. 1-00125.)  Dr. Bouché testified that Ms. Harris will more likely than not require a new pair of orthotics every three years.  (Bouché Dep. at 65.)  Dr. Storey testified that Ms. Harris will more likely than not require a new pair of orthotics every four to five years.  (Storey Dep. at 38.)  The court finds that Ms. Harris will require a new pair of orthotics every four years for the remainder of her life.

30.     Ms. Harris will likely require some anti-inflammatory medication for her knee injury on an episodic basis.  (Storey Dep. at 39.)

31.     Ms. Harris and the Government stipulate that $42,971.86 in past medical expenses were reasonably necessary to the diagnosis and treatment of Ms. Harris's injuries caused by the September 13, 2005 collision and that the expenses were reasonable in amount.  (Stipulation and Order Re: Admitted Medical Expenses ("Stip.") (Dkt. # 55) ¶¶ 1, 3, 5.)

32.     In addition to the stipulated medical expenses, Ms. Harris attended medical appointments with Dr. Watt on November 4, 2008 (Ex. 3-00009), and November 10, 2008 (Ex. 3-00010), and underwent an MRI test on November 7, 2008 (Ex. 3-00016).  The court finds that the November 4, 2008 appointment related to both Ms. Harris's tib-fib injury and to the mechanical-catching problem.  In his notes of the November 4, 2008 appointment, Dr. Watt states that he informed Ms. Harris that it would be reasonable to perform an MRI scan of her right knee "to see if there is anything that would account for the mechanical catching."  (Ex. 3-00009.)  The court finds that the November 7, 2008

MRI was related only to the mechanical catching problem, not Ms. Harris's tib-fib injury.

Dr. Watt's notes from the November 10, 2008 appointment, which was a follow-up appointment after the MRI, indicate that Dr. Watt and Ms. Harris primarily discussed the mechanical catching problem at the appointment, but "also discussed the pain from the area of the proximal tibiofibular joint." (Ex. 3-00010.) The court finds that the November 10, 2008 appointment was related primarily to the mechanical catching problem, but also involved discussion of Ms. Harris's tib-fib injury.

## II. CONCLUSIONS OF LAW

1. Ms. Harris brought this case pursuant to the FTCA. This court has jurisdiction pursuant to 28 U.S.C. § 1346(b). Venue is proper in the Western District of Washington pursuant to 28 U.S.C. § 1402 because Ms. Harris resides in this judicial district and the acts and omissions complained of occurred in this district.

2. Washington law provides the substantive law to govern this case because the collision occurred in Washington. 28 U.S.C. § 1346(b); *Richards v. United States*, 369 U.S. 1, 11 (1962).

3. Pursuant to the FTCA, the Government shall be liable "in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages." 28 U.S.C. § 2674. Ms. Harris's recovery is limited by 28 U.S.C. § 2675(b) (no recovery in excess of administrative claim) and 28 U.S.C. § 2412(d)(1)(A) (no recovery of attorney's fees). In her previously-filed administrative claim, Ms. Harris requested damages in the amount of $2,900,000.00.

(Compl. (Dkt. # 1) ¶ 3.4.)  Pursuant to 28 U.S.C. § 2675(b), Ms. Harris is limited to a total maximum recovery of $2,900,000.00.

4.     Ms. Harris seeks damages for past and future medical expenses and for noneconomic damages.  Ms. Harris does not seek damages for past or future lost wages or damages for the costs of retraining.  (Agreed Facts ¶ 3(a)(vi) & (vii).)

5.     Mr. Schaeffer had a duty to Ms. Harris to exercise reasonable care in the operation of the vehicle so as to avoid injuring her.  Mr. Schaeffer breached his duty of care to Ms. Harris.  Mr. Schaeffer's breach of his duty of care was the proximate cause of the injuries to Ms. Harris, as described above.  The Government is vicariously liable for Mr. Schaeffer's breach.

6.     On September 16, 2008, the court granted Ms. Harris's motion for partial summary judgment (Dkt. # 13).  Pursuant to the court's order, "(1) defendant United States has sole fault for the September 13, 2005 collision, (2) plaintiff Clancy Anne Harris is not at fault for the September 13, 2005 collision, and (3) no third parties not a party to this lawsuit are at fault for the September 13, 2005 collision."  (September 16, 2008 Order (Dkt. # 13) at 1-2.)

7.     Washington law provides that the court "must determine the amount of money that will reasonably and fairly compensate the plaintiff for such damages as . . . were proximately caused by the negligence of the defendant."  WPI 30.01.01.  The burden of proving damages by a preponderance of the evidence rests with Ms. Harris.  WPI 30.01.01.

FINDINGS OF FACT & CONCLUSIONS OF LAW – 13

8.      "A proximate cause is one that in natural and continuous sequence, unbroken by an independent cause, produces the injury complained of and without which the ultimate injury would not have occurred." *Attwood v. Albertson's Food Ctrs., Inc.*, 966 P.2d 351, 353 (Wash. Ct. App. 1998).  "Whether or not causation must be shown with expert testimony depends on the nature of the injury.  Expert testimony is required to establish causation when an injury involves obscure medical factors that would require an ordinary lay person to speculate or conjecture in making a finding." *Bruns v. PACCAR, Inc.*, 890 P.2d 469, 477 (Wash. Ct. App. 1995).  As discussed above, the court concludes that Ms. Harris suffered injury to her right knee, right foot, right ankle, and lower to middle back as a proximate result of the September 13, 2005 collision.  This conclusion is supported by the testimony of Drs. Bouché, Storey, Toomey, and Watt, who testified that these injuries were caused by the September 13, 2005 collision.  (*See* Bouché Dep. at 20; Storey Dep. at 9-11; Toomey Dep. at 24, 34; Watt Dep. at 15, 36-37.)  Ms. Harris has not established that the mechanical catching problems in her right knee or her plantar fasciitis were caused by the September 13, 2005 collision.  (*See* Bouché Dep. at 77 (plantar fasciitis); Watt Dep. at 15, 41 (mechanical catching).)

9.      The Government has not met its burden in showing that Ms. Harris's back injury or strain was either caused by the 2001 collision and/or was caused or aggravated by the 2006 collision.  First, the Government has not identified any evidence supporting the conclusion that the 2001 collision caused lasting or significant injury to Ms. Harris's back.  Second, with respect to the 2006 accident, although Dr. Toomey testified that he

has never seen a rear-end collision that did not aggravate preexisting back pain, he also stated that he could not determine the extent to which Ms. Harris's back injury was aggravated by the 2006 collision.  (Toomey Dep. at 36.)  By contrast, Dr. Storey testified that Ms. Harris's back injuries from the 2006 collision did not correlate with her back injury or strain from the September 13, 2005 collision.  (Storey Dep. at 28-29.)  On this record, the court concludes that the Government has not met its burden in showing that the 2006 collision either caused Ms. Harris's current back condition or that it aggravated her back condition.  *See Bruns*, 890 P.2d at 477.

10.     Washington law requires the court to reduce Ms. Harris's damages to the extent that she unreasonably failed to mitigate her damages.  *Jaeger v. Cleaver Const., Inc.*, 201 P.3d 1028, 1037 (Wash. Ct. App. 2009); *Cox v. Keg Rests. U.S., Inc.*, 935 P.2d 1377, 1380 (Wash. Ct. App. 1997).  "The party asserting an unreasonable failure to mitigate bears the burden of proof."  *Cox*, 935 P.2d at 1380.  Expert testimony is required in those cases where a determination of causation turns on "obscure medical factors."  *Id.*

11.     The Government argues that Ms. Harris's recovery must be reduced because she unreasonably failed to mitigate her damages by wearing high-heeled shoes at home and at work.  (Def. Brief (Dkt. # 49) at 9.)  Drs. Bouché and Storey both advised Ms. Harris not to wear high-heeled shoes.  (Bouché Dep. at 74; Storey Dep. at 47; *see also* Toomey Dep. at 40.)  Despite these instructions, Ms. Harris wore high-heeled shoes at home and at work on at least a limited number of occasions.  (Harris Test. at 65.)  Nonetheless, the evidence shows that Ms. Harris's decision to wear high-heeled shoes did not aggravate

her injuries or delay her recovery. (Storey Dep. at 54; *see also* Bouché Dep. at 46.)

Further, a review of the testimony indicates that Dr. Bouché advised Ms. Harris not to

wear high-heeled shoes because this increased the likelihood that she would sprain her

ankle, not because the mere act of wearing high-heeled shoes caused deleterious effects.

(Bouché Dep. at 46.) The court is also of the opinion that Ms. Harris's decision to try

wearing high-heeled shoes on a limited number of occasions as part of the recovery

process and to test her physical limits was not unreasonable. Therefore, the court

concludes that Ms. Harris did not unreasonably fail to mitigate her damages by wearing

high-heeled shoes at home and at work on limited occasions.

12.      The Government also argues that Ms. Harris unreasonably failed to mitigate her

damages by not complying with her prescribed physical therapy treatment. (Def. Brief at

9.) Dr. Toomey notes that, after reading Dr. Bouché's notes, there were "some problems

in terms of attending therapy sessions." (Toomey Dep. at 40.) Dr. Bouché's notes,

however, indicate that Ms. Harris was dissatisfied with her original physical therapist and

merely requested to be recommended to different physical therapist. (Ex. 1-00065.) The

court concludes that the Government has not met its burden in demonstrating that Ms.

Harris unreasonably failed to mitigate her damages by not complying with her prescribed

physical therapy treatment.

13.      Having concluded that the September 13, 2005 collision was the proximate cause

of injuries to Ms. Harris and that Ms. Harris did not unreasonably fail to mitigate her

damages, the court must determine the appropriate amount of damages.

FINDINGS OF FACT & CONCLUSIONS OF LAW – 16

14.   <u>Past Medical Expenses</u>.  The parties stipulate that past medical expenses in the amount of $42,971.86 were reasonable and necessary to Ms. Harris's diagnosis and treatment for injuries caused by the September 13, 2005 collision.  (Stip. ¶ 5.)

15.   The parties dispute whether additional past medical expenses in the total amount of $1,394.00 were reasonable and necessary.  These charges arose from Ms. Harris's medical appointments with Dr. Watt on November 4, 2008 (Exs. 3-00009, 3-00019 ($156.00)), and November 10, 2008 (Exs. 3-00010, 3-00019 ($114.00)), and an MRI test on November 7, 2008 (Exs. 3-00016, 3-00020 ($1,124.00)).  Because Ms. Harris has not established that the September 13, 2005 collision was the proximate cause of the mechanical-catching problem in her right knee, past medical expenses related to the mechanical catching are not reasonable and necessary.  The court concludes that past medical expenses in the amount of $156.00 for the November 4, 2008 appointment and $114.00 for the November 10, 2008 appointment were reasonable and necessary because these appointments involved Ms. Harris's tib-fib injury.  By contrast, the court concludes that past medical expenses in the amount of $1,124.00 for the November 7, 2008 MRI were not reasonable and necessary because the MRI related only to the mechanical catching problem.

16.   The court awards total past medical expenses of $43,241.86.

17.   <u>Future Medical Expenses</u>.  An award for future medical expenses must be reduced to present cash value.  WPI 34.02.  The rate of interest to be applied in determining present cash value should be the rate that is reasonable under the circumstances.  WPI

34.02.  The court must take into consideration the prevailing rates of interest in the area

that can reasonably be expected from safe investments that a person of ordinary prudence,

but without particular financial skill or experience, can make in the locality.  WPI 34.02.

The court takes judicial notice of the formula for reducing expenses to present cash value:

$PV = FV / (1 + r)^y$.  *See Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 537 n.21

(1983).  Ms. Harris argues that the court should apply a rate of 1.16 based on the Three-

Year Daily Treasury Yield Curve Rate for April 2009.  (Pl. Brief (Dkt. # 47) at 16 & Ex.

3.)  Ms. Harris presented no testimony regarding the appropriateness of this rate or

prevailing rates of interest in the Seattle, Washington area.  The court is satisfied,

however, that the rate proposed by Ms. Harris is reasonable under the circumstances and

that it represents a conservative rate.

18.     Ms. Harris will require foot orthotics every four years for the remainder of her life,

which is estimated at 52.80 years.  Orthotics costs $375.70 per pair.  Ms. Harris is

entitled to an award of future medical expenses in the amount of $3,589.12, which is the

present cash value of the cost of orthotics at $375.70 per pair every 4 years over 52 years.

The court has reviewed Ms. Harris's calculation of the present cash value for her future

medical expenses.  (*See* Pl. Brief, Ex. 3.)  The court's own calculations differ slightly

from Ms. Harris's calculations, albeit by a de minimis amount.[1]  Without further

---

[1] The court calculates the present cash values at $358.76, $342.59, $327.14, $312.39, $298.31, $284.86, $272.02, $259.75, $248.04, $236.86, $226.18, $215.98, and $206.24, for a total of $3,589.12.  By contrast, Ms. Harris calculates the present cash values at $358.57, $342.40, $326.97, $312.23, $298.15, $284.71, $271.87, $259.61, $247.91, $236.73, $226.16, $215.87, and $206.13, for a total of $3,587.31.  (Pl. Brief, Ex. 3.)  The difference between the

FINDINGS OF FACT & CONCLUSIONS OF LAW – 18

information from Ms. Harris regarding the basis for her calculations, the court adopts its

own calculations as to present cash value.

19.     The court awards future medical expenses of $3,589.12.

20.     <u>Noneconomic Damages</u>. Washington law defines the term "noneconomic

damages" to mean "subjective, nonmonetary losses, including, but not limited to pain,

suffering, inconvenience, mental anguish, disability or disfigurement incurred by the

injured party, emotional distress, loss of society and companionship, loss of consortium,

injury to reputation and humiliation, and destruction of the parent-child relationship."

RCW 4.56.250(1)(b).  The term "disability" includes not only the incapacity to work, but

also impairment of a plaintiff's ability to lead a normal life.  *Parris v. Johnson*, 479 P.2d

91, 95 (Wash. Ct. App. 1970).  Noneconomic damages need not be reduced to present

cash value, WPI 34.02, nor are noneconomic damages susceptible to precise measurement

or mathematical certainty, *Rasor v. Retail Credit Co.*, 554 P.2d 1041, 1051 (1976), and

*Wagner v. Monteilh*, 720 P.2d 847, 849-50 (Wash. Ct. App. 1986).

21.     Ms. Harris argues that the court should award $2,000.00 in noneconomic damages

for the day of collision.  She next contends that the court should award $182,500.00 in

noneconomic damages for the two-year period following the collision, which constitutes a

rate of $250.00 per day for 730 days.  Finally, she proposes three different amounts for

the remaining past and future noneconomic damages: First, Ms. Harris argues in favor of

a "market rate," which she calculates at a daily rate of $157.25, which is the cost of an

---

two amounts is $1.81.

FINDINGS OF FACT & CONCLUSIONS OF LAW – 19

injection to her tib-fib joint, for 19,710 days which equals a total of $3,099,397.00. She concedes that this amount would necessarily be reduced to a total overall recovery of $2,900,000.00 because that is the amount she requested in her administrative claim. Second, Ms. Harris argues in favor of a "minimum wage rate," which she calculates at an hourly rate of $5.85, which is the 2007 federal minimum wage, for 17 hours per day for 19,710 days which equals a total of $1,960,159.00. Third, Ms. Harris argues in favor of a "half minimum wage rate," which she calculates at an hourly rate of $2.92, which is half of the 2007 federal minimum wage, for 17 hours per day for 19,710 days which equals a total of $978,404.00.

22.     The Government argues that the court should award a total sum of $80,000.00, which would include any award for past and future medical expenses.

23.     The court concludes that Ms. Harris is entitled to an award of noneconomic damages in the amount of $168,169.02 for pain and suffering caused by the September 13, 2005 collision.  *See* RCW 4.56.250(1)(b).  This amount will compensate Ms. Harris for pain and suffering connected to the day of the collision, her recovery period, and the remainder of her life.  Although Ms. Harris segregates her requested noneconomic damages into three distinct periods, the court declines to do so.  Ms. Harris has established that she experienced and will continue to experience varying levels of pain and suffering as a proximate result of the September 13, 2005 collision.  The court is satisfied that an award of noneconomic damages in the amount of $168,169.02 will

1   reasonably and fairly compensate Ms. Harris for the injuries proximately caused by Mr.

2
3   Schaeffer. *See* WPI 30.01.01.

4   24.     The court awards total overall damages of $215,000.00, which includes Ms.

5   Harris's past medical expenses, future medical expenses, and noneconomic damages.

6
7   25.     The court awards Ms. Harris judgment against the Government in conformity with

8   the foregoing.

9       Dated this 28th day of May, 2009.

10
11
12                      _____

13                       JAMES L. ROBART
                        United States District Judge

14
15
16
17
18
19
20
21
22
23
24
25
26
27
28